**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAURA WILLIS ALBRIGO and ANITA JOHNSON, individually and on behalf of all other persons similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>MGM RESORTS INTERNATIONAL,<br><br>Defendant. | Case No. '23CV1797 JLS  BLM<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Laura Willis Albrigo and Anita Johnson ("Plaintiffs") file this class action complaint on behalf of themselves and all others similarly situated against Defendant MGM Resorts International ("MGM" or "Defendant"). Plaintiffs bring this action based upon personal knowledge of the facts pertaining to themselves, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1.     Plaintiffs bring this class action lawsuit on behalf of all California residents who have stayed at Defendant's resort hotels or spent money in Defendant's casinos nationwide.

2.     Plaintiffs seek to hold Defendant responsible for the injuries Defendant inflicted on Plaintiffs and thousands of similarly situated persons ("Class members") due to Defendant's impermissibly inadequate data security, which caused the personal information of Plaintiffs and those similarly situated to be exfiltrated by unauthorized cybercriminals (the "Data Breach" or "Breach") at a still undetermined and/or undisclosed time. The Breach was made public on or around September 7, 2023.[1]

## JURISDICTION AND VENUE

3.     The Court has personal jurisdiction over the matter because the events giving rise to the cause of action occurred as a result of Defendant's purposely directed contacts with California and its residents.

4.     This Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount of controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed classes, and at least one Class Member, is a citizen of a state different from Defendant.

---

[1] *Hackers say they stole 6 terabytes of data from casino giants MGM, Caesars*, Reuters, https://www.reuters.com/business/casino-giant-caesars-confirms-data-breach-2023-09-14/ (last visited Sept. 23, 2023).

5.    Venue is proper in this District under 28 U.S.C. §1391(b) because a substantial portion of the events giving rise to Plaintiffs' claims occurred here.

## THE PARTIES

*Defendant*

6.    Defendant MGM Resorts International is a Delaware corporation with its principal place of business located at 3600 Las Vegas Boulevard South, Las Vegas, Nevada 89109. Defendant owns and operates entertainment and hospitality establishments across the world, with majority of its locations within the United States.

*Plaintiffs*

7.    Plaintiff Laura Willis Albrigo is an adult citizen of the state of California and is domiciled in San Diego, California.

8.    Plaintiff Albrigo has stayed at the Mandalay Bay hotel and casino, owned and operated by Defendant and located in Las Vegas, Nevada.

9.    Plaintiff Anita Johnson is an adult citizen of the state of California and is domiciled in Castaic, California.

10.    Plaintiff Johnson has stayed at the Park MGM hotel and casino, as well as the Luxor hotel and casino, both owned and operated by Defendant and located in Las Vegas, Nevada.

## FACTUAL ALLEGATIONS

11.    Defendant is an international hotel and casino entertainment company who owns and operates casino gaming brands with resorts throughout the United States, which include dining, live entertainment, accommodations, shopping, and gaming.

12.    As a condition of receiving its products and/or services, Defendant requires consumers, including Plaintiffs and Class members, to entrust it with highly sensitive personal information, including individuals' name, address, date of birth, driver's license or state ID number, and Social Security number ("personally

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

identifiable information" or "PII").[2]   Defendant retains this information for at least many years and even after the consumer relationship has ended.

13.     Defendant made promises and representations to its consumers, including Plaintiffs and Class members, that the PII collected from them would be kept safe, confidential, that the privacy of that information would be maintained, and that Defendant would delete any sensitive information after it was no longer required to maintain it.

14.     Indeed, Defendant's Privacy Policy provides that: "[i]nformation maintained in electronic form that is collected by MGM Resorts International and any individual MGM Resort is stored on systems protected by industry standard security measures. These security measures are intended to protect these systems from unauthorized access."[3]

15.     Plaintiffs and Class members have taken reasonable steps to maintain the confidentiality of their PII. Plaintiffs and Class members provided their PII to Defendant with the reasonable expectation and on the mutual understanding that Defendant would keep their sensitive PII confidential, maintain its system security, use the PII for business purposes only, and to only disclose the information to authorized and trusted personnel.

16.     Defendant had a duty to adopt reasonable measures to protect the PII of Plaintiffs and Class members from involuntary disclosure to third parties. Defendant has a legal duty to keep consumers' PII safe and confidential.

17.     Defendant had obligations created by the FTC Act, contract, industry standards, and representations made to Plaintiffs and Class members, to keep their PII confidential and to protect it from unauthorized access and disclosure.

---

[2] https://www.bleepingcomputer.com/news/security/mgm-resorts-shuts-down-it-systems-after-cyberattack/ (last accessed Sep. 20, 2023).

[3] https://www.mgmresorts.com/en/privacy-policy.html

CLASS ACTION COMPLAINT

18.     Defendant derived a substantial economic benefit from collecting Plaintiffs' and Class members' PII. Without the required submission of PII, Defendant could not perform the services it provides.

19.     By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class members' PII, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class members' PII from disclosure.

### A.     The Data Breach

20.     On September 11, 2023, MGM posted a message on their social media informing consumers they were experiencing a "cyber security incident" that was affecting some of their "systems."[4]   For the following ten days, MGM consumers reported being unable to use electronic room keycards, wireless internet, ATM kiosks, make electronic payments, use MGM resort services, or use electronic gambling devices like slot machines.[5]

21.     At least two cybercriminal groups have taken credit for the attack against Defendant. First, a hacking group known as "The Scatter Spider" took credit for accessing and acquiring "six terabytes of data from the systems of multi-billion-dollar casino operators MGM Resorts International[.]"[6]

22.     The following day, on September 12, 2023, a group of cyberattackers known as ALPHV claimed responsibility for the attack by tweeting that they infiltrated the MGM system by identifying an employee through LinkedIn and making one phone

---

[4]https://twitter.com/MGMResortsIntl?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1701256032369164399%7Ctwgr%5Eeaf0d08b5dabae5a8794c74343c6044f1b637463%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fwww.cshub.com%2Fattacks%2Fnews%2Fa-full-timeline-of-the-mgm-resorts-cyber-attack

[5] https://www.wusa9.com/article/news/nation-world/mgm-resorts-computers-restored-after-10-day-shutdown/507-960b53d2-c1c7-4c29-8fe7-e10b17a5d203

[6] https://www.reuters.com/business/casino-giant-caesars-confirms-data-breach-2023-09-14/.

CLASS ACTION COMPLAINT

call to the tech support department. They further stated "[a] company valued at $33,900,000,000 was defeated by a 10 minute conversation."[7]

23.    On September 14, 2023, ALPHV issued a statement regarding the cyberattacks, stating that although they had been in MGM's systems since September 8, 2023, they did not deploy any ransomware attacks until September 11, 2023 "after trying to get in touch [with MGM] but failing." The group further explained MGM's "mixed responses" and efforts with negotiations.[8]

24.    A ransomware attack, like the one MGM experienced, is a "software cybercriminals use to block you from accessing your own data" to "encrypt the files on your system" and hold the data hostage until the demanded ransom is paid.[9] According to the Center for Internet Security, companies should treat ransomware attacks as any other data breach incident because ransomware attacks don't just hold networks hostage and/or publicly post the data—rather, "ransomware groups sell stolen data in cybercriminal forums and dark web marketplaces for additional revenue."[10]

25.    A marketplace report released in 2020 found over 50% of ransomware attackers exfiltrated data from a network before encrypting it. [11]   Once the data is exfiltrated from a network, its confidential nature is destroyed and it should be

---

[7] https://www.forbes.com/sites/suzannerowankelleher/2023/09/13/ransomware-attack-mgm-resorts/?sh=7b455d3d5f38

[8] https://www.cybersecurityconnect.com.au/commercial/9567-alphv-ransomware-gang-releases-lengthy-statement-on-mgm-hack#:~:text=%E2%80%9CAs%20reported%2C%20MGM%20shut%20down,to%20set%20the%20record%20straight.%E2%80%9D&text=According%20to%20ALPHV%20%E2%80%93%20it%20is,to%20them%20being%20shut%20down.

[9] https://www.unitrends.com/solutions/ransomware-education

[10] https://www.cisecurity.org/insights/blog/ransomware-the-data-exfiltration-and-double-extortion-trends

[11]   https://www.coveware.com/blog/q3-2020-ransomware-marketplace-report

CLASS ACTION COMPLAINT

"assume[d] it will be traded to other threat actors, sold, or held for a second/future extortion attempt."[12] And even where companies pay for the return of data, attackers often leak or sell the data regardless because there is no way to verify copies of the data are destroyed.

**B.    Defendant Acquires, Collects, and Stores Plaintiffs' and Class Members' Valuable PII.**

26.    Defendant collected, retained, and stored the PII of Plaintiffs and Class members and derived a substantial economic benefit from that PII.   But for the collection of Plaintiffs' and Class members' PII, Defendant would not be unable to perform its services.

27.    Individuals, including Plaintiffs and Class members, who have stayed at Defendant's resorts, utilized Defendant's entertainment services, including its casinos, and/or sought to join the MGM Rewards loyalty program were required to entrust Defendant with sensitive, non-public PII, to obtain entertainment and/or hospitality services from Defendant. Defendant retains this information for at least many years, even after the consumer relationship has ended.

28.    By obtaining, collecting, and storing the PII of Plaintiffs and Class members, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting the PII from disclosure.

29.    The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[13]

30.    Driver's license numbers, which were likely compromised in the Data

---

[12] *Id.*

[13] *Your personal data is for sale on the dark web. Here's how much it costs*, DIGITAL TRENDS, Oct. 16, 2019, https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Sept. 25, 2023).

CLASS ACTION COMPLAINT

Breach, are incredibly valuable. "Hackers harvest license numbers because they're a very valuable piece of information."[14] A driver's license can be a critical part of a fraudulent, synthetic identity – which go for about $1,200 on the dark web. On its own, a forged license can sell for around $200.[15]

31.     According to cybersecurity specialty publication CPO Magazine, "[t]o those unfamiliar with the world of fraud, driver's license numbers might seem like a relatively harmless piece of information to lose if it happens in isolation."[16] However, this is not the case. As cybersecurity experts point out:

> "It's a gold mine for hackers. With a driver's license number, bad actors can manufacture fake IDs, slotting in the number for any form that requires ID verification, or use the information to craft curated social engineering phishing attacks."[17]

32.     Victims of driver's license number theft also often suffer unemployment benefit fraud, as described in a recent New York Times article.[18]

33.     Based on the foregoing, the information at issue in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card

---

[14] *Hackers Stole Customers' License Numbers From Geico In Months-Long Breach*, Forbes, Apr. 20, 2021, available at: https://www.forbes.com/sites/leemathews/2021/04/20/hackers-stole- customers-license-numbers-from-geico-in-months-long-breach/?sh=3bda585e8658 (last visited Sept. 25, 2023).

[15] *Id.*

[16] https://www.cpomagazine.com/cyber-security/geico-data-breach-leaks-drivers-license-numbers-advises-customers-to-watch-out-for-fraudulent-unemployment-claims/

[17] *Id.*

[18] How Identity Thieves Took My Wife for a Ride, NY Times, April 27, 2021, available at: https://www.nytimes.com/2021/04/27/your-money/identity-theft-auto-insurance.html (last visited on Sept. 21, 2023).

CLASS ACTION COMPLAINT

accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

34. Moreover, Social Security numbers are among the worst kind of PII to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number can lead to identity theft and extensive financial fraud.[19]

35. Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

36. The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used.

37. The information held by Defendant in its computer systems at the time of the Data Breach included the unencrypted PII of Plaintiffs and Class members.

**C.     Defendant Knew Or Should Have Known It Was At Risk Of Cyberattacks**

38. Defendant was aware of its vulnerabilities to cyberattacks like the one alleged. On August 31, 2023, Okta, the IT vendor used by Defendant, warned of "a consistent pattern of social engineering attacks against IT service desk personnel, in which the caller's strategy was to convince service desk personnel to reset all Multi-factor Authentication (MFA) factors enrolled by highly privileged users." In their statement, Okta included a list of tactics hackers were using, as well as a "detailed set of recommendations" for companies to implement to prevent a ransomware hacking

---

[19] Social Security Administration, Identity Theft and Your Social Security Number, available at: https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Sept. 25, 2023).

CLASS ACTION COMPLAINT

like the one that occurred.[20]

39.     This type of social engineering attack Okta warned Defendant of is the exact type of attack Defendant fell victim to.[21]

40.     Data thieves regularly target companies like Defendant due to the highly sensitive information in their custody. Defendant knew and understood that unprotected PII is valuable and highly sought after by sophisticated criminal parties who seek to illegally monetize that PII through unauthorized access.

41.     According to the Identity Theft Resource Center's 2022 Data Breach Report, 1,802 data compromises were reported in 2022, with 422.1 million people affected by the reported breaches.[22]

42.     In fact, Defendant has been the subject of previous data hacks. In 2019, the personal information of over 10.6 million MGM hotel guests were obtained by cyberattackers and were subsequently published publicly on the internet.[23] More recently in November 2022, BetMGM, an online gaming platform owned by Defendant, alerted customers that their personal information was compromised in a data breach five months prior and was just now discovered. Since the breach, records of over 1.5 million BetMGM consumers have been offered for sale on the dark web.[24]

43.     In light of Okta's warnings to Defendant, Defendant's own experience with cyberattacks and breaches, and myriad recent high profile data breaches at other

---

[20] https://sec.okta.com/articles/2023/08/cross-tenant-impersonation-prevention-and-detection?ref=thestack.technology.

[21] https://www.techtarget.com/searchsecurity/news/366552775/Okta-Caesars-MGM-hacked-in-social-engineering-campaign.

[22] https://www.idtheftcenter.org/post/2022-annual-data-breach-report-reveals-near-record-number-compromises/.

[23] https://www.zdnet.com/article/exclusive-details-of-10-6-million-of-mgm-hotel-guests-posted-on-a-hacking-forum/.

[24] https://www.bleepingcomputer.com/news/security/leading-sports-betting-firm-betmgm-discloses-data-breach/

CLASS ACTION COMPLAINT

industry leading companies, including Microsoft, Wattpad, Facebook, Twitter, and Estee Lauder, Defendant knew or should have known that the PII they collected and maintained could and would be targeted by cybercriminals.

44.     Despite this, Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiffs and Class members, allowing the attackers free access to the PII stored therein. Defendant failed to implement procedures like those recommended by Okta, failed to properly verify the credentials of the attacker, and failed to have in place systems to prevent and detect the ransomware attack.

45.     At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiffs and Class members and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class members as a result of a breach.

46.      Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's server(s), amounting to, upon information and belief, potentially millions of individuals' detailed PII, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

47.     Upon information and belief, Plaintiffs' and Class members' unencrypted PII was compromised and stolen by the cyberattackers in the September 2023 Data Breach. Plaintiffs further believe their PII, and that of Class members, has been or will be sold on the dark web, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

48.     Defendant could have prevented the Data Breach by implementing the recommendations sent by Okta, properly securing its network and encrypting the files and files servers containing the PII of Plaintiffs and Class members, and by taking the

necessary steps to prevent further breaches from occurring after previous hacking incidents.

49.     Once it was made aware of the Data Breach, Defendant did not take any action to alert Plaintiffs and Class members of the Breach, nor did it take reasonable steps in negotiating and ensuring the PII would not be further compromised or made public.  In fact, Defendant has yet to disclose **any** information regarding the details of the Data Breach to those injured, including Plaintiffs and Class members.

50.     Plaintiffs and Class members have taken reasonable steps to maintain the confidentiality of their PII and relied on Defendant to keep their PII confidential and maintained securely, to use this information for business purposes only, and to make only authorized disclosures of this information.

**D.     Defendant Failed To Comply With FTC Guidelines**

51.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an 'unfair practice' in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

52.     In October 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal consumer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating

11

someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

53.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

54.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

55.     As evidenced by the Data Breach, Defendant failed to properly implement basic data security practices and failed to audit, monitor, or ensure the integrity of its vendor's data security practices. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class members' PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

56.     Defendant was at all times fully aware of its obligation to protect the PII of its consumers yet failed to comply with such obligations. Defendant was also aware of the significant repercussions that would result from its failure to do so.

**E.     Defendant Failed To Comply With Industry Standards**

57.     Despite its alleged commitment to securing sensitive PII, Defendant does not follow industry standard practices in securing PII.

58.     Some industry best practices that should be implemented by entertainment companies dealing with sensitive PII, like Defendant, include but are not limited to: educating all employees, strong password requirements, multilayer

12

security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, and limiting which employees can access sensitive data. As evidenced by the Data Breach, Defendant failed to follow some or all of these industry best practices.

59.    Other best cybersecurity practices that are standard in the entertainment industry include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points. As evidenced by the Data Breach, Defendant failed to follow these cybersecurity best practices.

60.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC- 1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

61.    Defendant failed to comply with these accepted standards in the entertainment industry, thereby permitting the Data Breach to occur.

**F.     Common Injuries and Experiences of Plaintiffs and Class Members**

62.    Plaintiffs and Class members are California residents who have stayed at one or multiple of Defendant's resorts, and/or utilized Defendant's entertainment offerings, including spending money in one or multiple of Defendant's casinos. In doing so, Plaintiffs and Class members were required to provide their PII to Defendant, including but not limited to, name, date of birth, contact information, and Social Security number.

63.    At the time of the Data Breach, Defendant retained Plaintiffs' PII in its system.

13

64.     Plaintiffs are very careful about sharing their sensitive PII. Plaintiffs regularly monitor their credit and banking information and have increased their monitoring since learning of the breach. Plaintiffs have changed their relevant passwords and pins since learning of the breach. Plaintiff Johnson cancelled a credit card, and got new cards issued for two other accounts out of caution since learning of the breach, including one that was flagged for possible fraudulent activity.

65.     Plaintiffs have never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiffs would not have entrusted their PII to Defendant had he known of Defendant's lax data security policies.

66.     When Defendant announced the Data Breach, it deliberately underplayed the Breach's severity and obfuscated the nature of the Breach. To date, Defendant has failed to explain how the Breach occurred (what security weakness was exploited), what exact data elements of each affected individual were compromised, who the Breach was perpetrated by, and the extent to which those data elements were compromised.

67.     Because of the Data Breach, Defendant inflicted injuries upon Plaintiffs and Class members, including but not limited to, their PII ending up in the possession of criminals, the risk of identity theft, invasion of privacy, the continued mitigation of the materialized risk of identity theft, and the loss of benefit of the bargain.

68.     Plaintiffs and Class members entrusted their PII to Defendant and were deprived of the benefit of their bargain. Plaintiffs had the reasonable expectation and understanding that Defendant would take—at minimum—industry standard precautions to protect, maintain, and safeguard that information from unauthorized users or disclosure, and would timely notify them of any data security incidents. After all, Plaintiffs would not have entrusted their PII to any entity that used Defendant's services had they known that Defendant would not take reasonable steps to safeguard their information. Accordingly, Plaintiffs and Class members received products and/or

services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

69.     The unencrypted PII of Plaintiffs and Class members will end up for sale on the dark web because that is the *modus operandi* of hackers. In addition, unencrypted PII may fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiffs and Class members. Unauthorized individuals can easily access the PII of Plaintiffs and Class members.

70.     The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes.

71.     Given the type of targeted attack in this case and sophisticated criminal activity, the type of PII involved, and the volume of data obtained in the Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes——e.g., opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

72.     Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

73.     Consequently, Plaintiffs and Class members are at a present and continuous risk of fraud and identity theft for many years into the future.

74.     Plaintiffs and Class members suffered actual injury from having their PII compromised in the Data Breach including, but not limited to, (a) damage to and

diminution in the value of their PII—a form of property that Defendant obtained from Plaintiffs; (b) violation of their privacy rights; (c) the likely theft of their PII; (d) fraudulent activity resulting from the Breach; and (e) present and continuing injury arising from the increased risk of additional identity theft and fraud.

75.     As a result of the Data Breach, Plaintiffs and Class members also suffered emotional distress because of the release of their PII—which they believed would be protected from unauthorized access and disclosure. Now, Plaintiffs and Class members will suffer anxiety about unauthorized parties viewing, selling, and/or using their PII for nefarious purposes like identity theft and fraud.

76.     Plaintiffs and Class members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience as a result of the Data Breach, such as researching and verifying the legitimacy of the Data Breach.

77.     Plaintiffs and Class members have a continuing interest in ensuring that their PII, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

78.     Defendant's use of outdated and insecure computer systems and software that are easy to hack, and its failure to maintain adequate security measures and an up-to-date technology security strategy, demonstrates a willful and conscious disregard for privacy, and has failed to adequately protect the PII of Plaintiffs and potentially thousands of members of the proposed Class to unscrupulous operators, con artists, and outright criminals.

79.     Defendant's failure to properly notify Plaintiffs and members of the proposed Class of the Data Breach exacerbated Plaintiffs' and the Class members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

CLASS ACTION COMPLAINT

### CLASS ALLEGATIONS

80.     Plaintiffs bring this action individually and on behalf of all other persons similarly situated, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

81.     Plaintiffs seek to represent a class defined as "All Individuals whose PII was disclosed in the Data Breach (the "Class").

82.     Plaintiffs also seek to represent a subclass defined as "All California residents whose PII was disclosed in the Data Breach" (the "California Subclass")

83.     Excluded from the Class are Defendant and its parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

84.     Plaintiffs reserve the right to modify or amend the definition of the proposed Class, as well as add subclasses, before the Court determines whether certification is appropriate.

85.     The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

86.     Numerosity. The Class members are so numerous that joinder of all members is impracticable. Upon information and belief, Plaintiffs believe that the proposed Class includes potentially hundreds of thousands of individuals who have been damaged by Defendant's conduct as alleged herein. The precise number of Class members is unknown to Plaintiffs but may be ascertained from Defendant's records.

87.     Commonality. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

     a.  Whether Defendant engaged in the conduct alleged herein;

     b.  Whether Defendant's conduct violated the FTCA;

17

c.  When Defendant learned of the Data Breach;

d.  Whether Defendant's response to the Data Breach was adequate;

e.  Whether Defendant unlawfully shared, lost, or disclosed Plaintiffs' and Class members' PII;

f.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the PII compromised in the Data Breach;

g.  Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

h.  Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

i.  Whether Defendant owed a duty to Class members to safeguard their PII;

j.  Whether Defendant breached its duty to Class members to safeguard their PII;

k.  Whether hackers obtained Class members' PII via the Data Breach;

l.  Whether Defendant had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiffs and the Class members;

m. Whether Defendant breached its duty to provide timely and accurate notice of the Data Breach to Plaintiffs and Class members;

n.  Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

o.  What damages Plaintiffs and Class members suffered as a result of Defendant's misconduct;

p.  Whether Defendant's conduct was negligent;

q.  Whether Defendant was unjustly enriched;

CLASS ACTION COMPLAINT

r.  Whether Plaintiffs and Class members are entitled to actual and/or statutory damages;

s.  Whether Plaintiffs and Class members are entitled to additional credit or identity monitoring and monetary relief; and

t.  Whether Plaintiffs and Class members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

88.  <u>Typicality.</u> Plaintiffs' claims are typical of those of other Class members because Plaintiffs' PII, like that of every other Class Member, was compromised in the Data Breach. Plaintiffs' claims are typical of those of the other Class members because, inter alia, all Class members were injured through the common misconduct of Defendant. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class members, and there are no defenses that are unique to Plaintiffs. The claims of Plaintiffs and those of Class members arise from the same operative facts and are based on the same legal theories.

89.  <u>Adequacy of Representation.</u> Plaintiffs will fairly and adequately represent and protect the interests of Class members. Plaintiffs' counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

90.  <u>Predominance.</u> Defendant has engaged in a common course of conduct toward Plaintiffs and Class members in that all of Plaintiffs' and Class members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Defendant's conduct affecting Class members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

91.  <u>Superiority.</u> A Class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely

19

to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for Defendant. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

92.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2). Defendant has acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

93.     Finally, all members of the proposed Class are readily ascertainable. Defendant has access to the names and addresses and/or email addresses of Class members affected by the Data Breach.

## COUNT I
### Negligence and Negligence *Per Se*
### (On behalf of Plaintiffs and the Class)

94.     Plaintiffs restate and reallege each and every paragraph above as if fully set forth herein.

95.     Defendant requires its consumers, including Plaintiffs and Class members, to submit non-public PII in the ordinary course of providing its services.

96.     Defendant gathered and stored the PII of Plaintiffs and Class members as part of its business of soliciting its services to its consumers, which solicitations and services affect commerce.

97.    Plaintiffs and Class members entrusted Defendant with their PII with the understanding that Defendant would safeguard their information.

98.    Defendant had full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and Class members could and would suffer if the PII were wrongfully disclosed.

99.    By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

100.    Defendant had a duty to employ reasonable security measures under Section 5 of the FTCA, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

101.    Defendant owed a duty of care to Plaintiffs and Class members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the PII.

102.    Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiffs and Class members. That special relationship arose because Plaintiffs and the Class entrusted Defendant with their confidential PII, a necessary part of being consumers of Defendant.

103.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

104.    Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiffs or the Class.

105.   Defendant also had a duty to exercise appropriate clearinghouse practices to remove former consumers' PII it was no longer required to retain pursuant to regulations.

106.   Moreover, Defendant had a duty to promptly and adequately notify Plaintiffs and the Class of the Data Breach.

107.   Defendant had and continues to have a duty to adequately disclose that the PII of Plaintiffs and the Class within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

108.   Defendant breached its duties, pursuant to the FTCA and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Class members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

    a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class members' PII;

    b. Failing to adequately monitor the security of their networks and systems;

    c. Failing to audit, monitor, or ensure the integrity of its vendor's data security practices;

    d. Allowing unauthorized access to Class members' PII;

    e. Failing to detect in a timely manner that Class members' PII had been compromised;

    f. Failing to remove former consumers' PII it was no longer required to retain pursuant to regulations; and

    g. Failing to timely and adequately notify Class members about the Data Breach's occurrence and scope, so that they could take appropriate

22

steps to mitigate the potential for identity theft and other damages.

109.  Defendant violated Section 5 of the FTCA by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

110.  Plaintiffs and Class members were within the class of persons the FTCA was intended to protect and the type of harm that resulted from the Data Breach was the type of harm it was intended to guard against.

111.  Defendant's violation of Section 5 of the FTCA constitutes negligence per se.

112.  The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

113.  A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

114.  It was foreseeable that Defendant's failure to use reasonable measures to protect Class members' PII would result in injury to Class members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the entertainment industry.

115.  Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and the Class could and would suffer if the PII were wrongfully disclosed.

116.  Plaintiffs and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the PII of Plaintiffs and the Class, the

23

critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on Defendant's systems.

117.  It was therefore foreseeable that the failure to adequately safeguard Class members' PII would result in one or more types of injuries to Class members.

118.  Plaintiffs and the Class had no ability to protect their PII that was in, and possibly remains in, Defendant's possession.

119.  Defendant was in a position to protect against the harm suffered by Plaintiffs and the Class as a result of the Data Breach.

120.  Defendant's duty extended to protecting Plaintiffs and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

121.  Defendant has admitted that the PII of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

122.  But for Defendant's wrongful and negligent breach of duties owed to Plaintiffs and the Class, the PII of Plaintiffs and the Class would not have been compromised.

123.  There is a close causal connection between Defendant's failure to implement security measures to protect the PII of Plaintiffs and the Class and the harm, or risk of imminent harm, suffered by Plaintiffs and the Class. The PII of Plaintiffs and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

CLASS ACTION COMPLAINT

124.   As a direct and proximate result of Defendant's negligence, Plaintiffs and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; and (vii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

125.   As a direct and proximate result of Defendant's negligence, Plaintiffs and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

126.   Additionally, as a direct and proximate result of Defendant's negligence, Plaintiffs and the Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

127.   Plaintiffs and Class members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

128.   Defendant's negligent conduct is ongoing, in that it still holds the PII of Plaintiffs and Class members in an unsafe and insecure manner.

129.   Plaintiffs and Class members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class members.

CLASS ACTION COMPLAINT

## COUNT II
### Breach of Implied Contract
### (On Behalf of Plaintiffs and the Class)

130.   Plaintiffs restate and reallege each and every paragraph above as fully set forth herein.

131.   Plaintiffs and Class members were required to provide their PII to Defendant as a condition of receiving services and loyalty program membership from Defendant.

132.   Plaintiffs and the Class entrusted their PII to Defendant. In so doing, Plaintiffs and the Class entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiffs and the Class if their data had been breached and compromised or stolen.

133.   In entering into such implied contracts, Plaintiffs and Class members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

134.   Implicit in the agreement between Plaintiffs and Class members and the Defendant to provide PII, was the latter's obligation to: (a) use such PII for business purposes only, (b) take reasonable steps to safeguard that PII, (c) prevent unauthorized disclosures of the PII, (d) provide Plaintiffs and Class members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII, (e) reasonably safeguard and protect the PII of Plaintiffs and Class members from unauthorized disclosure or uses, (f) retain the PII only under conditions that kept such information secure and confidential.

135.   The mutual understanding and intent of Plaintiffs and Class members on the one hand, and Defendant, on the other, is demonstrated by their conduct and course of dealing.

26

CLASS ACTION COMPLAINT

136.   Defendant solicited, offered, and invited Plaintiffs and Class members to provide their PII as part of Defendant's regular business practices. Plaintiffs and Class members accepted Defendant's offers and provided their PII to Defendant.

137.   In accepting the PII of Plaintiffs and Class members, Defendant understood and agreed that it was required to reasonably safeguard the PII from unauthorized access or disclosure.

138.   On information and belief, at all relevant times Defendant promulgated, adopted, and implemented written privacy policies whereby it expressly promised Plaintiffs and Class members that it would only disclose PII under certain circumstances, none of which relate to the Data Breach.

139.   On information and belief, Defendant further promised to comply with industry standards and to make sure that Plaintiffs' and Class members' PII would remain protected.

140.   Plaintiffs and Class members paid money and provided their PII to Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

141.   Plaintiffs and Class members would not have entrusted their PII to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

142.   Plaintiffs and Class members would not have entrusted their PII to Defendant in the absence of their implied promise to monitor their computer systems and networks to ensure that it adopted reasonable data security measures.

143.   Plaintiffs and Class members fully and adequately performed their obligations under the implied contracts with Defendant.

144.   Defendant breached the implied contracts it made with Plaintiffs and the Class by failing to safeguard and protect their personal information, by failing to delete the information of Plaintiffs and the Class once the relationship ended, and by failing

CLASS ACTION COMPLAINT

to provide accurate notice to them that personal information was compromised as a result of the Data Breach.

145.   As a direct and proximate result of Defendant's breach of the implied contracts, Plaintiffs and Class members sustained damages, as alleged herein, including the loss of the benefit of the bargain.

146.   Plaintiffs and Class members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

147.   Plaintiffs and Class members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class members.

## COUNT III
### Restitution or Unjust Enrichment
### (On Behalf of Plaintiffs and the Class)

148.   Plaintiffs restate and reallege each and every paragraphs above as if fully set forth herein.

149.   This count is pleaded in the alternative to the Breach of Implied Contract claim above (Count II).

150.   Plaintiffs and Class members conferred a monetary benefit on Defendant. Specifically, they paid for services from and enrolled in loyalty program membership with Defendant and in so doing also provided Defendant with their PII. In exchange, Plaintiffs and Class members should have received from Defendant the services that were the subject of the transaction and should have had their PII protected with adequate data security.

151.   Defendant knew that Plaintiffs and Class members conferred a benefit upon it and has accepted and retained that benefit by accepting and retaining the PII entrusted to it. Defendant profited from Plaintiffs' retained data and used Plaintiffs'

and Class members' PII for business purposes.

152. Defendant failed to secure Plaintiffs' and Class members' PII and, therefore, did not fully compensate Plaintiffs or Class members for the value that their PII provided.

153. Defendant acquired the PII through inequitable record retention as it failed to disclose the inadequate data security practices previously alleged.

154. If Plaintiffs and Class members had known that Defendant would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their PII, they would not have entrusted their PII at Defendant or obtained loyalty program membership at Defendant.

155. Plaintiffs and Class members have no adequate remedy at law.

156. Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiffs and Class members conferred upon it.

157. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; and (vii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

158. Plaintiffs and Class members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiffs

and Class members may seek restitution or compensation.

159.   Plaintiffs have no adequate remedy at law for this claim.  Plaintiffs plead their claim for unjust enrichment in the alternative, which inherently would necessitate a finding of no adequate remedy at law.  Alternatively, legal remedies available to Plaintiffs are inadequate because they are not "equally prompt and certain and in other ways efficient" as equitable relief. *American Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937); *see also U.S. v. Bluitt*, 815 F. Supp. 1314, 1317 (N.D. Cal. Oct. 6, 1992) ("the 'mere existence' of a possible legal remedy is not sufficient to warrant denial of equitable relief"); *Quist v. Empire Water Co.*, 2014 Cal. 646, 643 (1928) ("The mere fact that there may be a remedy at law does not oust the jurisdiction of a court of equity. To have this effect, the remedy must also be speedy, adequate, and efficacious to the end in view … It must reach the whole mischief and secure the whole right of the party in a perfect manner at the present time and not in the future").   Furthermore:

    a.   To the extent damages are available here, damages are not equally certain as restitution because the standard that governs ordering restitution is different than the standard that governs damages. Hence, the Court may award restitution even if it determines that Plaintiffs fail to sufficiently adduce evidence to support an award of damages.

    b.   Damages and restitution are not necessarily the same amount. Unlike damages, restitution is not limited to the amount of money defendant wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles Plaintiffs to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize. Plaintiffs seek such relief here.

c.  Legal claims for damages are not equally certain as restitution because claims under the UCL and unjust enrichment entail few elements.

160.   A claimant otherwise entitled to a remedy for unjust enrichment, including a remedy originating in equity, need not demonstrate the inadequacy of available remedies at law." Restatement (Third) of Restitution, § 4(2).

**COUNT IV**
**California Customer Records Act**
**Cal. Civ. Code §§ 1798.80, *et seq*.**
**(On Behalf of Plaintiffs and the California Subclass)**

161.   Plaintiffs restate and reallege each and every paragraphs above as if fully set forth herein.

162.   "[T]o ensure that personal information about California residents is protected," the California legislature enacted Cal. Civ. Code § 1798.81.5, which requires that any business that "owns, licenses, or maintains personal information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the PII from unauthorized access, destruction, use, modification, or disclosure."

163.   MGM is a business that owns, maintains, and licenses personal information (or "PII"), within the meaning of Cal. Civ. Code § 1798.81.5, of Plaintiffs and Class members.

164.   Businesses that own or license computerized data that includes PII, including Social Security numbers, are required to notify California residents when their PII has been acquired (or is reasonably believed to have been acquired) by unauthorized persons in a data security breach "in the most expedient time possible and without unreasonable delay." Cal. Civ. Code § 1798.82. Among other requirements, the security breach notification must include "the types of PII that were

or are reasonably believed to have been the subject of the breach." Cal. Civ. Code § 1798.82.

165.   MGM is a business that owns or licenses computerized data that includes PII as defined by Cal. Civ. Code § 1798.82.

166.   Plaintiffs' and Class members' PII (*e.g.*, Social Security numbers) includes PII as covered by Cal. Civ. Code § 1798.82.

167.   Because MGM reasonably believed that Plaintiffs' and Class members' PII was acquired by unauthorized persons during the MGM Data Breach, MGM had an obligation to disclose the Data Breach in a timely and accurate fashion as mandated by Cal. Civ. Code § 1798.82.

168.   MGM failed to fully disclose material information about the Data Breach, including the types of PII impacted.

169.   By failing to disclose the Data Breach in a timely and accurate manner, MGM violated Cal. Civ. Code § 1798.82.

170.   As a direct and proximate result of MGM's violations of the Cal. Civ. Code §§ 1798.81.5 and 1798.82, Plaintiffs and Class members suffered damages, as described above.

171.   Plaintiffs and Class members seek relief under Cal. Civ. Code § 1798.84, including actual damages and injunctive relief.

### COUNT V
**California Unfair Competition Act**
**Cal. Bus. & Prof. Code §§ 17200, *et seq*.**
**(On Behalf of Plaintiffs and the California Subclass)**

172.   Plaintiffs restate and reallege each and every paragraphs above as if fully set forth herein.

173.   MGM is a "person" as defined by Cal. Bus. & Prof. Code §17201.

174.   MGM violated Cal. Bus. & Prof. Code §§ 17200, *et seq*. ("UCL") by engaging in unlawful, unfair, and deceptive business acts and practices.

CLASS ACTION COMPLAINT

175. MGM's "unfair" acts and practices include:

a. MGM failed to implement and maintain reasonable security measures to protect Plaintiffs' and Class members' PII from unauthorized disclosure, release, data breaches, and theft, which was a direct and proximate cause of the Data Breach.

b. MGM failed to identify foreseeable security risks, remediate identified security risks, and adequately improve security following previous cybersecurity incidents, as described herein. This conduct, with little if any utility, is unfair when weighed against the harm to Plaintiffs and Class members, whose PII has been compromised.

c. MGM's failure to implement and maintain reasonable security measures also was contrary to legislatively declared public policy that seeks to protect consumers' data and ensure that entities that are trusted with it use appropriate security measures. These policies are reflected in laws, including the FTC Act, 15 U.S.C. § 45, California's Consumer Records Act, Cal. Civ. Code § 1798.81.5, and California's Consumer Privacy Act, Cal. Civ. Code § 1798.100.

d. MGM's failure to implement and maintain reasonable security measures also resulted in substantial consumer injuries, as described above, that are not outweighed by any countervailing benefits to consumers or competition. Moreover, because consumers could not know of MGM's grossly inadequate security, consumers could not have reasonably avoided the harms that MGM caused.

e. MGM engaged in unlawful business practices by violating Cal. Civ. Code § 1798.82.

176. MGM has engaged in "unlawful" business practices by violating multiple laws, including California's Consumer Records Act, Cal. Civ. Code §§ 1798.81.5 (requiring reasonable data security measures) and 1798.82 (requiring timely breach

33

notification), California's Consumers Legal Remedies Act, Cal. Civ. Code §§ 1780, *et seq*., the FTC Act, 15 U.S.C. § 45, and California common law.

177.   MGM's unlawful, unfair, and deceptive acts and practices include:

a.   Failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs' and Class member's members' PII, which was a direct and proximate cause of the Data Breach;

b.   Failing to identify and remediate foreseeable security and privacy risks and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c.   Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

d.   Misrepresenting that they would protect the privacy and confidentiality of Plaintiffs' and Class members' PII, including by implementing and maintaining reasonable security measures;

e.   Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45;

f.   Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiffs' and Class members' PII; and

g.   Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, California's

34

Consumer Privacy Act, Cal. Civ. Code § 1798.100, California's Consumer Records Act, Cal. Civ. Code §§ 1798.80, *et seq.* and 1798.81.5, which was a direct and proximate cause of the Data Breach.

178.   MGM's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of MGM's data security and ability to protect the confidentiality of consumers' PII.

179.   As a direct and proximate result of MGM's unfair, unlawful, and fraudulent acts and practices, Plaintiffs and Class members were injured and suffered monetary and non-monetary damages, as described herein, including but not limited to fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their PII; overpayment for MGM's services; loss of the value of access to their PII; and the value of identity protection services made necessary by the Breach.

180.   MGM acted intentionally, knowingly, and maliciously to violate California's Unfair Competition Law, and recklessly disregarded Plaintiffs' and Class members rights. MGM's numerous past data breaches put it on notice that its security and privacy protections were inadequate.

181.   Plaintiffs and Class members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from MGM's unfair, unlawful, and fraudulent business practices or use of their PII; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

    a.    For a determination that this action is a proper class action;

    b.    For an order certifying the Classes, naming Plaintiffs as representative of the Classes, and naming Plaintiffs' attorneys as Class Counsel to

represent the Classes;

c.    For an order declaring that Defendant's conduct violated the statutes referenced herein;

d.    For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

e.    For an award of compensatory damages, including statutory damages where available, to Plaintiffs and the Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial;

f.    For punitive damages, as warranted, in an amount to be determined at trial;

g.    For an injunctive requiring Defendant to adequately safeguard the PII of Plaintiffs and the Classes by implementing security procedures, included but not limited to:

    i.    prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

    ii.    requiring Defendant to protect, including through encryption, all data collected through the course of business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

    iii.    requiring Defendant to delete and purge the PII of Plaintiffs and Class members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class members;

    iv.    requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of Plaintiffs' and Class

36

members' PII;

   v.  requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring, simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis;

   vi. prohibiting Defendant from maintaining Plaintiffs' and Class members' PII on a cloud-based database until proper safeguards and processes are implemented;

   vii. requiring Defendant to segment data by creating firewalls and access controls so that, if one area of Defendant's network is compromised, hackers cannot gain access to other portion's of Defendant's systems;

   viii. requiring Defendant to conduct regular database scanning and securing checks;

   ix.  requiring Defendant to monitor ingress and egress of all network traffic;

   x.  requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling PII, as well as protecting the PII of Plaintiffs and Class members;

   xi. requiring Defendant to implement a system of tests to assess their respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

37

xii. requiring Defendant to implement, maintain, review, and revise as necessary a threat management program to appropriately monitor Defendant's networks for internal and external threats, and assess whether monitoring tools are properly configured, tested, and updated; and

xiii. requiring Defendant to meaningfully educate all Class members about the threats that they face because of the loss of its confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves.

h. For prejudgment interest on all amounts awarded;

i. For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees and expenses and costs of suit; and

j. For an order granting Plaintiffs and Class members such further relief as the Court deems appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves and the proposed Classes, demand a trial by jury for all of the claims asserted in this Complaint so triable.


Dated:                                              **BURSOR & FISHER, P.A**.

By:   /s/ L. Timothy Fisher
         L. Timothy Fisher

L. Timothy Fisher (State Bar No. 191626)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com

*Attorneys for Plaintiffs*

38